EDITH BROWN CLEMENT, Circuit Judge:
Plaintiffs-appellees Donnika Ivy (“Ivy”) and the other named plaintiffs (collectively, the “named plaintiffs”) are deaf individuals who brought a putative class action against defendant-appellant Michael Williams in his official capacity as head of the Texas Education Agency (the “TEA”). They request injunctive and declaratory relief requiring the TEA to bring driver education into compliance with the Americans with Disabilities Act (“ADA”) and Rehabilitation Act. The district court denied the TEA’s motion to dismiss but certified its order for immediate appeal under 28 U.S.C. § 1292(b). We granted leave for the TEA to file an appeal, and we now REVERSE and RENDER judgment dismissing the case.
*252 Facts and Proceedings
In Texas, individuals under the age of 25 cannot obtain driver’s licenses unless they submit a driver education certificate to the Department of Public Safety (“DPS”). Tex. Transp. Code Ann. § 521.1601.[1] Driver education certificates, in turn, are only available from private driver education schools licensed by the TEA. Tex. Educ. Code Ann. § 1001.101(a).[2] The named plaintiffs are all deaf individuals who contacted a variety of TEA-licensed private driver education schools, all of which informed the named plaintiffs that the schools would not accommodate them.[3] Because they cannot obtain driver education certificates, the named plaintiffs cannot obtain driver’s licenses.
A Deafness Resource Specialist with the Texas Department of Assistive and Rehabilitative Services informed the TEA of the inability of deaf individuals like the named plaintiffs to receive driver education certificates. But the TEA declined to intervene, stating that it was not required to enforce- the ADA and that it would not act against the private driver education schools unless the United States Department of Justice (“DOJ”) found that the schools had violated the ADA. The Deafness Resource Specialist filed a complaint against the TEA with the DOJ, which the DOJ apparently dismissed.
Ivy filed a lawsuit in federal district court against the TEA and a private driver education school, requesting injunctive and declaratory relief against both parties un *253 der the ADA. She later dismissed the private driver education school from the lawsuit. After some additional procedural steps that are not relevant here, the lawsuit became a putative class action with multiple named plaintiffs and the TEA as the sole remaining defendant. The live pleading, the Fourth Amended Complaint, requests injunctive and declaratory relief requiring the TEA to bring driver education into compliance with the ADA. The TEA filed a motion to dismiss for want of jurisdiction and for failure to state a claim. The district court denied these motions, certified its order for interlocutory appeal, and stayed the case. We granted the TEA leave to file an interlocutory appeal.
Standard of Review
We review de novo the denial of a motion to dismiss for want of jurisdiction and for failure to state a claim. Young v. Hosemann, 598 F.3d 184, 187-88 (5th Cir.2010).
Discussion
We first consider the TEA’s argument that the named plaintiffs lack standing to bring their claims; Finding that they have standing, we next consider whether they adequately state a claim upon which relief can be granted. We conclude that they do not, so we dismiss the case.
A. Standing
There are three requirements for standing: (1) the plaintiff must have suffered an “injury in fact,” (2) there must be “a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party before the court,” and (3) “it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and alterations omitted).
Here, the injury alleged is quite obvious—the named plaintiffs’ inability to receive driver education certificates, which in turn prevents them from receiving driver’s licenses. . The TEA challenges the named plaintiffs’ standing under the second and third prongs. The TEA argues that there is no causal connection between the named plaintiffs’ injury and the TEA’s conduct because it is the driver education schools, not the TEA, that refuse to accommodate the named plaintiffs. This contention is meritless. While driver education schools’ actions are one cause of the injury, it is equally clear that the named plaintiffs’ alleged injuries are also “fairly traceable” to the TEA’s failure to inform private driver education schools of their ADA obligations and its failure to deny licenses .to driver education schools that violate the ADA.[4]
The TEA next argues that a court order could not redress the plaintiffs’ alleged injuries. It advances three main arguments in support of this contention. First, it argues that it does not have the statutory authority under Texas law to ensure private driver education schools’ compliance with the .ADA. We disagree; multiple provisions of Texas law empower the TEA to perform actions that would likely redress the named plaintiffs’ injuries. For example, the TEA can issue a license to a driver education school only if the school “complies with all county, municipal, state, and federal regulations, including fire, building, and sanitation codes and assumed *254 name registration.” Tex. Educ.Code Ann. § 1001.204(7). Thus, the TEA has the power to withhold licenses from driver education schools that fail to comply with the DOJ’s ADA regulations.[5] Further, Texas law provides that the TEA “has jurisdiction over and control of’ driver education schools and is allowed to “adopt and enforce rules necessary to administer” the chapter on driver education. Tex. Educ. Code Ann. §§ 1001.051; 1001.053(a)(3). These provisions give the TEA the power to enact regulations relating to ADA compliance in driver education schools.
Second, the TEA argues that a federal court cannot order it to ensure that driver education schools comply with the ADA because the court would effectively be commandeering the state into implementing a federal program. This argument misses the mark. While the federal government cannot require states to implement a federal program, the federal government can require the states to comply with federal law. Reno v. Condon, 528 U.S. 141, 150-51, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000). The named plaintiffs are arguing that driver education schools are a “service, program, or activity” of the TEA. If they are correct, requiring the TEA to comply with the ADA in providing driver education would only require the state itself to comply with federal law, so the anti-commandeering doctrine would not be implicated.
Third, the TEA argues that withholding or revoking licenses from driver education schools would only shut down schools, not improve their compliance with the ADA. Similarly, the TEA argues that any potential fines would not necessarily change the schools’ behavior. But it seems highly unlikely that all driver education schools would choose to shut their doors or accept fines rather than comply with the ADA. Instead, it is likely that the TEA’S action would help redress the named plaintiffs’ injuries. Thus, the redressability requirement for standing is satisfied.
B. Failure to State a Claim
The named plaintiffs’ lawsuit fails on the merits, however. They sued under both the Rehabilitation Act and Title II of the ADA. It is uncontested that the TEA receives federal funding, which is a prerequisite for Rehabilitation Act coverage. See 29 U.S.C. § 794(a), (b)(1)(A). Besides this special prerequisite for the Rehabilitation Act, the ADA and Rehabilitation Act “are judged under the same legal standards, and the same remedies are available under both Acts.” Kemp v. Holder, 610 F.3d 231, 234 (5th Cir.2010) (per curiam). Further, “[t]he parties have not pointed to any reason why Title II and [the Rehabilitation Act] should be interpreted differently.” Frame v. City of Arlington, 657 F.3d 215, 224 (5th Cir.2011) (en banc). Thus, “[although we focus primarily on Title II, our analysis is informed by the Rehabilitation Act, and our holding applies to both statutes.” Id.
Title II of the ADA provides that “no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied *255 the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.” 42 U.S.C. § 12132. It is uncontested that the TEA is a public entity and that the named plaintiffs are qualified individuals with disabilities. The key question is whether the named plaintiffs have been “excluded from participation in or ... denied the benefits of the services, programs, or activities of [the TEA].” Id. To answer that question, we must decide whether driver education is a service, program, or activity of the TEA. We hold that it is not, although this is a close question for which the statutes, regulations, and case law provide little concrete guidance.
Starting with the plain text of Title II of the ADA, the phrase “services, programs, or activities of a public entity” is undefined. The Supreme Court has interpreted the phrase with reference to what “services, programs, or activities” are provided by the public entity. See Pa. Dep’t of Corr. v. Yeskey, 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (holding that prisons have “programs, services, or activities” because they “provide inmates with many recreational ‘activities,’ medical ‘services,’ and educational and vocational ‘programs’ ”). Here, the TEA itself does not teach driver education, contract with driver education schools, or issue driver education certificates to individual students. Instead, the TEA licenses and regulates private driver education schools, which in turn teach driver education and issue certificates. Thus, the TEA’s program provides the licensure and regulation of driving education schools, not driver education itself. Title II of the ADA therefore suggests that driver education is not a program, service, or activity of the TEA.
The Rehabilitation Act does define “program or activity,” defining it as “all the operations of’ a public entity. 29 U.S.C. § 794(b). In the context of interpreting this definition, we have explained that “Webster’s Dictionary broadly defines ‘operations’ as ‘the whole process of planning for and operating a business or other organized unit,’ and defines ‘operation’ as ‘a doing or performing especially] of action.” Frame, 657 F.3d at 227 (alteration in original) (quoting Webster’s Third New International Dictionary 1581 (1993)). Here, as explained above, the TEA does not operate or perform driver education because it does not teach driver education or contract with the schools that do so. Thus, driver education seems to fall outside of the ambit of the Rehabilitation Act’s definition of “program or activity.”
Turning to the regulations, the ADA tasks the Attorney General with promulgating regulations that implement Title II. 42 U.S.C. § 12134(a).[6] Unfortunately, these regulations do not further define what it means to be a service, program, or activity of a public entity.
The most relevant regulation is 28 C.F.R. § 35.130(b)(l)(v). Section 35.130(b)(1) provides that a public entity cannot discriminate against qualified individuals with disabilities “in providing any aid, benefit, or service,” whether the state acts “directly or through contractual, licensing, or other arrangements.” Subsection (v), which is not cited by the parties, provides that a state may not “[a]id or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates *256 on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity’s program.” 28 C.F.R. § 35.130(b)(l)(v).
But the regulations simply beg th'e ultimate question here. Section 35.130(b)(1) does not allow a state to discriminate “in providing any aid, benefit, or service,” but it does not define what it means for the state to “provid[e]” an “aid, benefit, or service.” As detailed above, the TEA does not provide driver education. Similarly, section 35.130(b)(l)(v) prohibits a state from aiding entities that discriminate against “beneficiaries of the public entity’s program,” but it does not define what it means for a program to be the “public entity’s.” It does not seem that a program of driver education belongs to the TEA.
Another regulation provides that “[t]he programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered.” 28 C.F.R. § 35.130(b)(6). But we agree with the named plaintiffs that this statement does not automatically immunize licensed activities from the ADA’s gamut, given that the regulations also provide that a public entity cannot discriminate “directly or through contractual, licensing, or other arrangements.” 28 C.F.R. § 35.130(b)(1).
Looking further to the interpretative guidance provided by the DOJ, the DOJ has specifically stated that a public entity “is not accountable for discrimination in the employment or other practices of [a company licensed by the public entity], if those practices are not the result of requirements or policies established by the [public entity].” Department of Justice, Title II Technical Assistance Manual § II-3.7200, available at http://www.ada.gov/ taman2.html (last visited Feb. 19, 2015).[7] Here, any failure of the driver education schools to comply with the ADA or Rehabilitation Act cannot be said to be “the result of. requirements or policies established by the” TEA. Instead, the named plaintiffs’ claim is at most that the TEA’s failure to establish requirements or policies has allowed private driver education schools to be inaccessible. Thus, the DOJ’s interpretative guidance indicates that the TEA is not accountable for the driver education schools’ inaccessibility because the TEA’S requirements and policies have not caused it.
Finally, as to case law, the named plaintiffs cite two lottery cases as their primary authority for finding that driver education is a program of the TEA. In those state supreme court cases, each court held that the state lottery was a program of the state lottery commission, so the ADA required the commission to make the lottery program accessible. Winborne v. Va. Lottery, 278 Va. 142, 677 S.E.2d 304, 307-08 (2009); Paxton v. State Dep’t of Tax & Revenue, 192 W.Va. 213, 451 S.E.2d 779, 784-85 (1994). Thus, even though the inaccessible lottery agents were private parties, the commission could be held liable under the ADA because it ran a lottery program that was inaccessible as a whole. Winbome, 677 S.E.2d at 307-08; Paxton, 451 S.E.2d at 785.
But there are two important differences between these lottery cases and this case. First, there, it was clear that the lottery commissions were running lotteries, not just licensing lottery agents. After all, the lottery commissions themselves conducted the lotteries; the agents that sold the tickets were just one component of that entire program. Here, in contrast, the TEA just *257 as clearly does not provide any portion of driver education; it merely licenses driver education schools. Second, in the lottery cases, the lottery commissions contracted with the lottery providers, which were paid commissions for acting as agents for the state. Winborne, 677 S.E.2d at 307; Paxton, 451 S.E.2d at 785. Here, there is no such agency or contractual relationship.[8] These cases are therefore unpersuasive.
The only other cases that have held a public entity liable for a private actor’s inaccessibility involved similar situations where the private actors had a contractual or agency relationship with the public entity. See, e.g., Castle v. Eurofresh, Inc., 731 F.3d 901, 910 (9th Cir.2013) (holding that state could be liable under ADA for inaccessibility of company it contracted with to provide state inmates with jobs); Indep. Hous. Servs. of S.F. v. Fillmore Ctr. Assocs., 840 F.Supp. 1328, 1344 (N.D.Cal.1993) (holding that “[t]he crucial distinction” that rendered the public entity liable for a private actor’s inaccessibility was that the public entity “ha[d] contracted with [the private actor] for [it] to provide aid, benefits, or services to beneficiaries of the [public entity’s] redevelopment program”). In the absence of such a contractual or agency relationship, courts have routinely held that a public entity is not hable for a licensed private actor’s behavior. See, e.g., Noel v. N.Y.C. Taxi & Limousine Comm’n, 687 F.3d 63, 72 (2d Cir.2012) (holding that public entity is not liable for inaccessible taxi companies it licenses and regulates); Bascle v. Parish, No. 12-CV-1926, 2013 WL 4434911, at *5-6 (E.D.La. Aug. 14, 2013) (same); Reeves v. Queen City Transp., Inc., 10 F.Supp.2d 1181, 1187 (D.Colo.1998) (holding that public utility company is not liable for inaccessible bus company it licenses where there is no contract between them); Tyler v. City of Manhattan, 849 F.Supp. 1429, 1441-42 (D.Kan.1994) (holding that city is not liable for inaccessible restaurants and liquor stores it licenses).
The importance of a contractual or agency relationship is also demonstrated by the DOJ’s interpretative guidance, which provides three examples of a private actor’s activities being covered by Title II because of the “close relationship” between the private actor and a public entity. See Department of Justice, Title II Technical Assistance Manual § II-1.3000. All three examples involve some form of contractual or agency relationship: a restaurant with a “concession agreement with a State department of parks”; a “joint venture” between a city and a private corporation; and a nonprofit organization that runs group homes “under contract with a State agency.” Id. Thus, we conclude that the lack of a contractual or agency relationship between driver education schools and the TEA cuts strongly against holding that driver education is a program of the TEA.
The named plaintiffs essentially argue that the TEA’s pervasive regulation and supervision of driver education schools transforms these schools into agents of the state. But we hold that the mere fact that the driver education schools are heavily regulated and supervised by the TEA does not make these schools a “service, program, or activity” of the TEA. Otherwise, states and localities would be required to ensure the ADA compliance of every heavily-regulated industry, a result that would raise substantial policy, economic, *258 and federalism concerns. Nothing in the ADA or its regulations mandates or even implies this extreme result. Thus, we join the Second Circuit in holding that public entities are not responsible for ensuring the ADA compliance of even heavily-regulated industries. See Noel, 687 F.3d at 72 (“[Cjontrol over the taxi industry, however pervasive it is at this time, does not make the private taxi industry ‘a program or activity of a public entity.’ ”). Beyond heavy regulation, the named plaintiffs allege only that the TEA provides sample course materials to driver education schools and sells blank driver education certificates to them. The provision of such sample course materials and blank certificates is simply not enough to turn the schools into proxies for the TEA.
Admittedly, this case is further complicated by the fact that the benefit provided by driver education schools — a driver education certificate — is necessary for obtaining an important governmental benefit — a driver’s license. Given the broad remedial purposes of the ADA, it would be extremely troubling if deaf young adults were effectively deprived of driver’s licenses simply because they could not obtain the private education that the State of Texas has mandated as a prerequisite for this important government benefit. But this concern does not transform driver education into a TEA program or service. Instead, it is partly resolved by the fact that the ADA regulations offer a potential avenue for relief against the DPS. See, e.g., 28 C.F.R. § 35.130(b)(8) (providing that a public entity cannot “apply eligibility criteria that screen out or tend to screen out” individuals with disabilities “from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered”). That is, the DPS may well be required to give exemptions to certain deaf individuals who cannot obtain driver education certificates, given that using these certificates as an eligibility criteria allegedly “screen[s] out or tend[s] to screen out” deaf people and may not be “necessary for the provision of the” driver’s license program. But the named plaintiffs have not sued the DPS, so we need not decide this issue.
We conclude that the TEA does not provide the program, service, or activity of driver education. Thus, it is not required to ensure that driver education complies with the ADA.
Conclusion
For the foregoing reasons, we REVERSE the district court’s order denying the TEA’s motion to dismiss and RENDER judgment that the case is dismissed with prejudice for failure to state a claim upon which relief can be granted.

. We note that § 521.1601 contains an error. The currently-effective version refers to Texas Education Code § 1001.101(a)(1) and (a)(2), even though there are not two subparts in the currently-effective version of § 1001.101(a). This problem was produced by the 2013 amendment to the Texas Education Code, which eliminated subsections (1) and (2) from § 1001.101. Compare Act of June 14, 2013, 2013 Tex. Sess. Law Serv. Ch. 716, § 1 (H.B. 3483), with Act of June 19, 2009, 2009 Tex. Sess. Law Serv. Ch. 1413, § 1 (S.B.1317).
The parties do not mention this error in the statute, however. We assume without deciding that the parties are correct that the overall effect of the statute is that individuals 18 years of age or older can take the driver education class for adults that is provided for in Texas Education Code § 1001.1015, even though § 1001.1015 is not mentioned in the currently-effective version of Texas Transportation Code § 521.1601.

. There are two exceptions that allow certain young adults to obtain driver education certificates through sources other than private driver education schools. See Tex. Transp. Code Ann. § 521.1601. First, individuals may receive driver education certificates by taking a class taught by a parent or another specified close relative. Id. § 521.205. All parties assume that the parent-taught course is available only for individuals who are under 18 years old, but the statute itself does not appear to limit parent-taught courses to those under 18. See id. § 521.1601 (stating that those under 25 years of age must: (1) take a parent-taught class, public driver education class, or private minor driver education class, or (2), if they are over 18 years old, take a private minor or adult driver education class). We assume without deciding that the parent-taught class is not available to those who are over 18 years old. If that is the case, parent-taught classes are not an option for any of the named plaintiffs because the only named plaintiff who was under 18 when the lawsuit was filed did not have a parent or other specified relative who could offer the parent-taught class.
Second, individuals can obtain driver education certificates from driver education classes offered at public schools. Tex. Educ. Code Ann. § 29.902. It is unclear whether any of the named plaintiffs are public school students who can receive driver education certificates through these public school programs. But the TEA has not argued that the named plaintiffs had this public school option available. We assume without deciding that it was unavailable to the named plaintiffs.

.At least one of the named plaintiffs has only a limited ability to read English, so a written driver education course would not be feasible.

. It is a separate question whether the TEA was legally required to perform these actions. That question goes to the merits of the case, not standing.

. The TEA argues that the meaning of “all county, municipal, state, and federal regulations” is limited by the specification that these regulations "includ[e] fire, building, and sanitation codes and assumed name registration.” See id. § 1001.204(7). We disagree. Under Texas law, "including” is defined as a "term[] of enlargement and not of limitation or exclusive enumeration,” and its use “does not create a presumption that components not expressed are excluded.” Tex. Gov’t Code Ann. § 311.005(13). Hence, the list following the word “including” does not limit the plain meaning of the phrase "all ... federal regulations,” a term that clearly encompasses the DOJ’s ADA regulations.

. The Attorney General's regulations are eligible for Chevron deference. Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

. The DOJ’s interpretative guidance is eligible for Skidmore deference. Christensen v. Harris Cnty., 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (citing Skidmore v. Swig & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

. The amici seem to argue that a contractual or agency relationship exists because driver education schools pay significant fees to be licensed by the TEA. We disagree. If driver education schools were acting as agents of the TEA in administering its driver education program, we would expect the TEA to pay the schools, not the other way around.