**Dustin A. KING, Plaintiff-Appellee,**

**v.**

**MARION CIRCUIT COURT,**
**Defendant-Appellant.**

United States of America, Intervenor on Appeal.

No. 16-3726

United States Court of Appeals, Seventh Circuit.

Argued April 6, 2017

Decided August 18, 2017

Rehearing and Rehearing En Banc Denied October 23, 2017

Andrea L. Ciobanu, Attorney, Ciobanu Law, PC, Kenneth J. Falk, Attorney, Indiana Civil Liberties Union, Gavin M. Rose, Attorney, ACLU of Indiana, Indianapolis, IN, for Plaintiff–Appellee.

Kyle Hunter, Attorney, Office of the Attorney General, Indianapolis, IN, for Defendant–Appellant.

Dayna Zolle, Attorney, Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for Intervenor.

Before EASTERBROOK, MANION, and HAMILTON, Circuit Judges.

EASTERBROOK, Circuit Judge.

A county in Indiana may subsidize private dispute resolution in domestic-relations cases. See Ind. Code § 33-23-6-2. Marion County has such a program, which it calls the Marion County Domestic Relations Alternative Dispute Resolution Plan. We call it the Plan. The Plan provides financial assistance for parties with modest means to help defray the cost of mediation. A party to a domestic-relations suit may request subsidized mediation, or the court may order it of its own accord.

Dustin King was a party to a domestic-relations case in the Marion Circuit Court. King asked the court to refer his case to mediation and authorize his participation in the subsidy program. The court ordered both. King, who is deaf, also asked the judge to provide an American Sign Language interpreter. The judge denied that request, explaining that the Plan does not include subsidies for interpreter services. The Circuit Court did, however, rescind its order of mediation, inviting King to return to court for resolution of his case. There he would have had an interpreter at no cost to him. King declined. He proceeded through mediation, employing his stepfather as an interpreter, and achieved a satisfactory outcome. The domestic-relations case was dismissed.

King then sued the Circuit Court in federal court under Title II of the Americans with Disabilities Act. He contended that, by refusing to provide him with a free interpreter in mediation, the Circuit Court "by reason of [his] disability ... denied [him] the benefits of the services, programs, or activities of a public entity". 42 U.S.C. § 12132. Following cross-motions for summary judgment and a bench trial, King prevailed, with the district court awarding him $10,380 in damages. The Marion Circuit Court now appeals.

■ We need not address the merits of King's Title II claim; another issue controls this case's outcome. The Marion Circuit Court is a division of the State of Indiana, so King's suit is one against Indiana itself. See *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Indiana has asserted sovereign immunity. And because sovereign immunity bears on whether a federal court may hear a case, we resolve it before considering the merits. See *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 64–65, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The district court held that Indiana does not enjoy sovereign immunity because this case falls within the abrogation of that immunity sustained in *Tennessee v. Lane*, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). We disagree with that conclusion.

■ Section 5 of the Fourteenth Amendment permits Congress to abrogate states' sovereign immunity when Congress deems that necessary to protect the substantive rights guaranteed by the Amendment's other provisions. See *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The § 5 power also permits Congress to authorize federal litigation to enforce rights guaranteed by the other amendments that have been incorporated against the states via the Fourteenth Amendment's Due Process Clause. *Lane*, 541 U.S. at 522–23, 124 S.Ct. 1978. It does not, however, permit Congress to authorize federal litigation against the states to enforce statutory rights under other grants of powers, such as the Commerce Clause. See *Kimel v. Florida Board of Regents*, 528 U.S. 62, 78–79, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Congress also may not work a "substantive change in constitutional protections"; it can enforce the Con-

stitution only as the Supreme Court · has understood it. *Boerne v. Flores*, 521 U.S. 507, 509, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

■ The Supreme Court has held that the § 5 enforcement power extends beyond remedying actual constitutional violations; it may also proscribe some facially constitutional conduct as a prophylactic measure against future violations. See *Lane*, 541 U.S. at 518, 124 S.Ct. 1978. For Congress to adopt such rules, however, there must be significant evidence that future violations are likely to occur, and the rules must target those likely violations. Otherwise, the rules rest on the commerce or spending powers rather than § 5, with consequences for venue of litigation against states. See *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 368, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Kimel*, 528 U.S. at 91, 120 S.Ct. 631.

In *Lane* the Supreme Court found that there was a great "volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services". 541 U.S. at 528, 124 S.Ct. 1978. Based on that body of evidence, the Court held that Title II properly abrogated states' sovereign immunity in cases "implicating the fundamental right of access to the courts". *Id.* at 533–34, 124 S.Ct. 1978. King has not made a similar showing that limits on the subsidy of court-annexed mediation services can deny him, or anyone else, access to judicial services.

■ The Constitution does not guarantee a freestanding "fundamental right of access to the courts". Thus there is no constitutional problem with filing fees or requiring litigants to pay for their own lawyers in civil cases, although those expenses may make litigation impractical if not impossible for some persons. See, e.g.,

*United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). *Lane* used the phrase "fundamental right of access to the courts" to denote a cluster of constitutional rights, such as due process of law, that are valid grounds on which Congress might abrogate state sovereign immunity. 541 U.S. at 522–23, 124 S.Ct. 1978. What those rights have in common is that they affect the adjudicatory process itself; they safeguard people's ability to get into court and receive a judicial decision. *Ibid.* A limited subsidy—the Plan pays for a mediator but not an interpreter—does not affect any of the rights catalogued in *Lane*.

If mediation in Marion County· functioned to prevent King from obtaining judicial attention, his access to the courts would have been in danger, just as courthouse ·· facilities that physically exclude handicapped persons block their access. That was· what led to *Lane*: a wheelchair-bound litigant could not reach a courtroom on the second floor of a building that lacked an elevator or any way to ·get ·a wheelchair up the stairs. King's attorney contends that, in Marion ·County, mediation must precede judicial resolution of all domestic-relations cases. His brief cites Marion County Local Court Rule LR49‑ADR2-209, under which certain ·parties "must submit" to mediation. ·But that rule applies only to "child related" litigation following a divorce, not to all domestic-relations cases. King has not contended that his case meets the criteria for mandatory mediation. Even if it did, the Local Rule requires mediation only when the parties cannot show "good cause" to come directly to court. A different rule says that a state judge "may" order mediation, if ·appropriate, in any domestic-relations case. See Indiana Rule for Alternative Dispute Resolution 1.6. Neither of these provisions makes mediation a general. condi-

tion precedent to litigation. Contrary to King's contention, both rules afford judges discretion to determine whether mediation is appropriate in each case.

The Circuit Court exercised that discretion in King's case, ultimately determining that mediation was not required. King admits that the Circuit Court offered to adjudicate his claims and to provide an in-court sign language interpreter at no cost to him. Such full judicial hearings have long been considered the gold standard of due process. See *Marchant v. Pennsylvania R.R.*, 153 U.S. 380, 387, 14 S.Ct. 894, 38 L.Ed. 751 (1894); *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). King does not contend that the Marion Circuit Court treats deaf litigants unfairly or that deaf litigants encounter any barrier to litigation on a par with litigants who can hear. The Circuit Court's invitation to litigate therefore afforded King full access to court.

■ The United States, which intervened on appeal under 28 U.S.C. § 2403(a) to defend the constitutionality of Title II as applied to this suit, relies on *United States v. Georgia*, 546 U.S. 151, 159, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), for the proposition that damages against states can be appropriate even when no one has been denied access to court. That is right in the abstract. "Congress may respond to a history of concealable [constitutional] violations by adopting precautionary rules that reduce .... the chance of [future] evasion". *Holmes v. Marion County Office of Family & Children*, 349 F.3d 914, 920 (7th Cir. 2003). But to the extent that statutory rules are unnecessary to prevent constitutional violations, they do not overcome sovereign immunity. See *Garrett*, 531 U.S. at 368, 121 S.Ct. 955.

The United States has not explained how awarding damages to King could ward off future unconstitutional conduct. As far as we know (and as far as King contends), the Circuit Court does not wield its power to order mediation as part of a scheme to bar the disabled from obtaining legal redress. It does not routinely demand mediation as a prerequisite to adjudication, knowing that the parties' disabilities will block mediation and so block litigation too. Nor does King contend that the Circuit Court plans to implement such a strategy in the future. What happened to him points to just the opposite conclusion. Our sample of one indicates that, when a disabled person might have trouble mediating, the Marion Circuit Court immediately offers full adjudication. We do not have any reason to believe that a single disabled person in Marion County will ever be denied access to court because of the limits on the subsidies provided by the Plan, or because of the mediation process as a whole. And in the absence of any other evidence, we cannot say that allowing King's damages action would plausibly function as a prophylactic against future constitutional violations.

We have now run out of theories about how awarding King damages under Title II would protect anyone's constitutional rights. King was invited to come to the Marion Circuit Court for resolution of his domestic-relations dispute. The Circuit Court therefore did not actually violate any right falling under *Lane*'s "fundamental access" umbrella. Nor could abrogating sovereign immunity avert future violations. King has not suggested that any constitutional right of access to court is under threat in Marion County. All of this leads to just one conclusion—that this case has no constitutional dimension at all. Title II therefore does not abrogate sovereign immunity here, and the Marion Circuit Court remains immune from this suit in federal court.

Since we do not decide the merits, King may, if he wishes, present his contentions to Indiana's courts. Even when Congress has not abrogated states' sovereign immunity, states themselves may waive it in full or in part. See *Alden v. Maine*, 527 U.S. 706, 755, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). Indiana is among many states that have consented to be sued in their own courts over many alleged wrongs. See *Hoagland v. Franklin Township Community School Corp.*, 27 N.E.3d 737, 749 (Ind. 2015); *Campbell v. State*, 259 Ind. 55, 62–63, 284 N.E.2d 733 (1972). We need not consider whether King's claim might be subject to the notice and timing rules of the Indiana Tort Claims Act, Ind. Code §§ 34-13-3-3, 34-13-3-6, or whether, because it is based on a statute, it is outside that law's requirements. Those and related issues are for the state's judiciary.

The judgment of the district court is reversed, and the case is remanded with instructions to dismiss without prejudice to raising a Title II claim in state court.